The next case on this morning's docket is People v. Franklin Edwards and let's see, we have Ms. Stacy for the appellate and Ms. I'm sorry, Nam or Nam? Nam for the appellate. We just call her Sunny. Well, she does look very sunny. Beautiful smile. Okay. Thank you, Your Honors. Your Honors, counsel, may it please the court, Kelly Stacy appearing on behalf of the state. At hearing on the defendant's motion to suppress in this case, the state presented testimony supporting its argument that officers working in concert may rely on dispatchers and other information from other officers that are working on the case in concert with the arresting officer. And that is in determining whether there is reasonable suspicion for a traffic stop or probable cause to make an arrest. In this case, two different attorneys started on the case on appeal. Another attorney from our office prepared the state's opening brief. Another attorney from OSAD prepared their answer brief. So the polling council and I are coming in at a whole different place in this brief. But the prior defense attorney accused the prior attorney for the state of misrepresenting facts to this court. But I think if this court looks at the state's brief, this is largely a red herring. And I feel like this is something that needs to be addressed because it was brought out in that brief. And I think it's a serious enough allegation that it does need to be addressed. The allegedly offensive statements are found from what I can gather at page 13 of the state's opening brief. Former defense counsel takes issue with the state's use of the word witnesses in its brief. In our view, his position was there were not several witnesses mentioned at the motion to suppress hearing. And that allegation is made at defendant's brief at page 16. The state's position is the defense construes the term witness far too narrowly. And this morning I took an opportunity to look at Black's law dictionary just to further clarify the issue for myself. And Black's defines the term witness as, in general, one who being present, personally sees or perceives a thing, a beholder, spectator, or eyewitness. In law, this is commonly referred to as an eyewitness or an occurrence witness. Black's refers also to another type of witness that this court is very familiar with. And that is a witness who comes into a court and testifies what he has seen, heard, or otherwise observed. And again, that is commonly referred to as a trial witness. The state's brief at page 13 appears to me to be a summary of the state's argument. I did not have an opportunity to talk to the prior attorney. But it certainly looks like it's something in the nature of a topic sentence. This is what the state is going to be showing. But it certainly is true that officers interviewed multiple occurrence witnesses. This does not mean that each of those occurrence witnesses actually came to court and testified. So the state's use of the word witness was not meant, I don't believe, to imply trial witnesses only, but also to occurrence witnesses. And it is important in establishing what officers may have known and determining whether there's reasonable suspicion to stop this more important focus. And this leads directly to the state's collective knowledge argument. In the reply brief, we cited the case from the second district, People v. Fox. It's a very important case, and I think it applies very much to this case. But in that Fox case, the defense argued that although officers were working in concert, the arresting officer did not know the defendant. So the issue in that Fox case was the defense was arguing, well, you may not have this officer that knew this, this officer that knew this, this officer that knew this, and this officer that knew this, but we don't have any evidence of what specific information those officers shared. And that argument, then, is all of those officers must all collectively and individually possess that knowledge. Well, I believe the Fox case should disabuse that notion. That is certainly not the standard in the Fox case, and the Fox case actually rejected the defendant's argument outright. And I'd like to read just a short excerpt from that Fox case. While the defendant argues that the sharing and exchange of information of defendant's participation in the crime is necessary before an arrest, we reject such an interpretation of the case law. While officers are acting in concert in investigating a crime or possible crime, probable cause can be established from all the information collectively received by the officers, even if not known to the arresting officer. Is it correct to say that this case should be evaluated on the basis of probable cause or a reasonable, articulable suspicion based upon clear stuff? Well, that is a very interesting question, Your Honor. I think it came up in the defense presentation of, well, why was it the state that presented these witnesses? And it seems a lot of confusion, at least at the trial court level, that has run over into this level. It appears to me, on a motion to suppress, when a defendant alleges that there's been a violation of a Fourth Amendment right, then it is the defense that bears the burden of presenting that evidence in the court. This case has a little bit different twist on it, and that is because we have, in addition to a motion to suppress, that motion was actually to suppress a confession. What that does is it changes the burden a little bit. Now, I hate to almost use that word burden in here, but the burden on that case on whether a confession is voluntary, the state has to present the evidence to show the confession was voluntary. So the case sort of got confused below, but I believe that what we can tell from this record is that the trial court's discussion about, well, what did Officer Abernathy know? What did Officer Cody know? And even whether or not it was important for the officer that made the arrest, that actually stopped the vehicle, to know whether or not that person was black or white. But this Fox case makes clear when it's a vehicle description and officers are working together, the arresting officer doesn't have to be in possession of all of that. Now, someone does have to be, and that person needs to come in and present testimony in court to establish what that collective information is. But to say the arresting officer or the officer that pulled the vehicle over needed to have all of that information himself is not borne out by the Fox case. And that is what we believe the trial court earned here in that the collective knowledge of police officers established a shooter, in this case, stood on the top of a maroon Ford Focus, firing multiple shots. One of the occurrence witnesses specifically identified the shooter as the maintenance man of the apartment complex. The Ford Focus was at the scene the entire time, never left the scene after the shooting. It remained under surveillance the entire time. And following the shooting, it had not left the scene until the officer present at the scene, I believe that was Officer Abernathy, radioed in that, hey, this car you told me to watch is leaving the scene now. And that is when the officer made the dispatch and said, well, go ahead and pull that car over if you see it. I believe under the Fox case, the state believes that it has established reasonable suspicion for that stop and probable cause for the arrest. Now, I think there was a little bit of a mix-up maybe in the briefing as to does this fall under a Terry stop? Well, under a Terry stop, usually what you see is a driver-related offense. We don't have that here. The car was used as a means of a getaway apparently here, of leaving the scene. That car also contained elements of the crime because apparently there were some, I don't know if they were bullet shells, fragments, what it was, but something was contained on the hood of the car that had been collected from the scene. So in this case, I believe what is important here is was there probable cause to believe that that vehicle was used by the shooter and it was important to stop that vehicle. And I believe the Fox case establishes that the state did have reasonable suspicion for the stop and probable cause for the arrest. And the state also believes nothing has been shown to establish that the defendant's statements were not voluntarily made. I know this case got awfully convoluted and complicated, but I think that's what the case really does come down to, a simple issue of whether there's reasonable suspicion for the stop. We believe there was under the collective theory of the investigation. It looks like you've got a question for me now. Well, I do because you kind of befuddled me with where you began, with the concern about the witnesses. I thought the issue was several, whether or not it was several witnesses, and the fact that there's a conjunctive and rather than a disjunctive. Am I off track? I think you're right, Your Honor. Now that you mention that, I believe the allegation was there were not several witnesses. I suppose that turns on what... Several, and I don't have the dictionary in front of me, but I thought it meant more than two. And then beyond that, I'm not sure, but a couple is two, several is more than two. That's my understanding of what the word several means. So I kind of replace it with the word multiple, and I think in this case, police obviously did interview multiple individuals on the scene. You both saw the defendant connected with the crime and the vehicle, or should it have been and or? I believe and or would probably be a better way to have phrased that. But I think it would be tragic for a grand attorney who... I don't even know the regroups she had filed, but maybe a slight careless ruling to then have that transmuted into a well-deliberated attempt to misrepresent things to the court. I just don't believe that's what happened here. So I believe that what the state tried to do was tie in what the multiple witnesses said to complete a story. And not every witness is going to see everything, but each one has a different thing to add to the story. And that's what the police officers are there to find out. It's a fluid situation, a whole lot of things going on, a lot of people coming and going. And we're looking at what did the police have to go on. And based upon these reports of the witnesses, the occurrence witnesses at the scene, we believe the state did have reasonable suspicion for the stop. And I apologize if I made the issue a lot more convoluted than it was at the time. It wasn't my intention, but if there are no other questions, we would just ask you to reverse order me. Thank you. Thank you. You'll have the opportunity to do that.  I believe it's the reasonable suspicion. Reasonable articulable suspicion. I think the judge's rulings were on pages 68 through maybe 71 or 72. And that's what the judge focuses on, the stop, that initial stop. And the state corrects either the judge or defense counsel at the trial court level saying, this is a we're talking about the stop here, the stop is the main thing that we're arguing, it's a reasonable articulable suspicion. So I think that's within the pages of 68 through 71. Let me ask you another question. Yes, Your Honor. I believe based upon the briefing that that is apparently what he said, but do you think that's what he did? Or did he apply a probable cause standard to a stop? Your Honor, I think the state actually corrected him there when the judge talked, I think the judge talked about probable cause and the state corrected him that it had to be a reasonable suspicion. And the state and the judge goes through, well, what does that mean? And I think the state cited to people be Wilford and talked about how it has to be a reasonable articulable suspicion, which is more than a hunch, but less than preponderance and it was not probable cause. So I believe that that's what the judge, the judge was corrected and the judge, when he made his findings or comments, that's what he was going off of. Does that answer your question? The Fourth Amendment permits a police officer to conduct a brief investigatory stop, where the officer reasonably believes that the person has committed, is committing, or will commit a crime, meaning that the officer has to have a reasonable articulable suspicion that criminal activity is afoot. The case here is simple and I think it's been a little, it's been a little convoluted, but it's simple. It's whether at the time that the patrol officer stopped the maroon Ford Focus, that the police as a whole had reasonable suspicion that the unknown driver of that car committed a crime or had committed or was going to commit. As I stated, the Fourth Amendment doesn't permit seizures of individuals based merely on a hunch, but that's what happened here. The relevant facts come, the relevant facts before this court come from the evidence that the state presented at the motion to suppress hearing on May 18, 2018. Most notably, we want to show that the state's evidence at the suppression hearing is without very crucial details. That includes the description of Mr. Edwards. All that the record provides is that we're looking for a suspect, his name is Franklin Edwards, and from the name he's a male. We don't know if he's 20 years old, 70 years old, five feet tall, seven feet tall, has facial hair, has no facial hair, you know, is thin, bulky, 100 pounds, 200 pounds, we just don't know. We don't even know if he's white, black, Asian, Hispanic, or Latin. Similarly, there's no description of the unknown shooter. As the state said, there's two named witnesses in this case. That's Anna Hall, who was a 911 caller, and Jeremy Gulley. Gulley said that Mr. Edwards, the maintenance man, was out there shooting. Ms. Hall, who says, I know the maintenance man, I know Mr. Edwards, he wasn't the shooter, it was an unknown person. But that unknown person was associated with Mr. Edwards. So there's two named witnesses based on the four officers that testified at the motion to suppress hearing. And from the two named witnesses, their statements are contradictory. And there's no description whatsoever about the shooter, the unknown shooter, or Mr. Edwards. Also, we don't have a real description about that unknown driver. We know that unknown driver is in a maroon Ford Focus, that he's a black male, but we know from Detective Coby's testimony that the maroon Ford Focus that patrol officer Abernathy was observing belonged to a female, and that female was Raquel Bacon, and Bacon was not a suspect here. So I think if we look at all the facts, even considering that the police act in concert, even if we assume that Coby knew what Abernathy knew, we have a black male in a maroon Ford Focus. But that merely just being a black male in a Ford Focus isn't a crime. And we don't know how much of the population in Belleville fit this description of being a black male in a maroon car or in a Ford Focus. Well, we do know that the Ford Focus had been, at least there was suspicion, that it had been involved in the criminal event. So I want to be very careful with that statement, Your Honor, if I describe it. So, yes, this maroon Ford Focus with the license plate E, some number, that maroon Ford Focus had footprints or something on it that was lifted. However, we can't connect that maroon Ford Focus to what Ms. Hall said. The eyewitness, who was the 911 caller, said that a maroon Ford Focus was involved, but there's nothing that's connecting that maroon Ford Focus to this maroon Ford Focus. And we don't know how many maroon Ford Focuses are out there. We know that there's multiple apartment complexes, multiple parking lots in this Freedom Drive apartment. Okay, I'm confused. Wasn't the officer dispatched to go watch the Ford Focus that had been identified with the occurrence? Well, so, Your Honor, there was a lot of cars that were damaged when the shooting occurred, correct? But didn't somebody see the person, whoever was involved, on top, on the hood of the Ford Focus shooting? So there's no named witness that said that. So I think one of the officers in passing may have said that we recovered evidence from this maroon Ford Focus, and that's why they're eyeing this, but that witness wasn't Ms. Hall. And Ms. Hall is the only one that connected Mr. Edwards to a maroon Ford Focus. The point here is that this maroon Ford Focus might not be the same one. All we know is that something was lifted, there were shots fired, so a lot of cars were damaged, a lot of cars, the registration and the plates were run, evidence was collected, but we can't connect these two, and I think that's in the... Okay, so I'm still not quite following you, because I guess there was some damage to the Ford Focus that was stopped. It had evidence of footprints and I guess some residual from the shells or something. I think it was just the footprints on the hood of the car. I think there were shell casings or whatnot throughout the crime scene, which was a really large crime scene is what the officers testified to. And that Ford Focus was being watched and left, and then the officers stopped that Ford Focus. So they know that it was the Ford Focus that had been under observation, and that at least somebody had connected with the event by either damage to it and or footprints. That's correct, Your Honor. Okay, so it's not just any Ford Focus. That's correct, Your Honor. So I guess what I'm trying to clarify is that this Marine Ford Focus with the footprints on it, that's not connected to Mr. Edwards directly. There's no direct connection, and there's no actual connection to the unknown driver. So pretty much we have this Marine Ford Focus... I understand the unknown driver, but didn't somebody say that the maintenance man had been driving that particular Ford Focus? That's Ms. Hall, but Ms. Hall's Marine Ford Focus doesn't connect. There's nothing directly connecting that Marine Ford Focus to this Marine Ford Focus. And I think the problem that we keep running into is that there's not enough evidence presented. We don't know if...so Detective Covey testified that a lot of cars, their plates were run. A lot of cars had damage. So we don't know if there's other Marine Ford Focuses that they were focusing on. All we have testimony about is this one here. And I think the problem is the car was stopped without knowing who was in the car. So we have this Marine Ford Focus. We have an unknown driver in the car. We have Covey back in his squad car, not at the scene, who's saying, hey, stop the car, you know, patrol officer Abernathy. We have...even with Abernathy's knowledge that this is a black male, we just have a black male in a maroon car that's driving off. When the police stopped this maroon car, they had to have more than a hunch that this was someone they were looking for. Because once again, this vehicle was registered to a female who was never a suspect. Thank you, Ms. Bell. Ms. Stacy, rebuttal. I think what we have here under the...and I can tell you're struggling probably the same amount that Sunny and I did when we inherited the case. But I think what we've got here is we've gotten multiple occurrence witnesses that plugged in additional information. One person tied the maintenance man to the shooting. Another person tied the maintenance man to sometimes he drives this vehicle. I think the bottom line is if the trial court is correct, and it certainly looks like the trial court is ruling it, or some of the questioning done by the trial court at page 7 of the record, the court says the collective knowledge of the police is your case. Abernathy doesn't know who Edwards is. Abernathy doesn't...well, he says it was a black male, but says he didn't communicate that to anybody, including not in his report. He sees the vehicle drive by. I think what we have here is a trial court hearing that kind of got lost in the minutiae. Because that Fox case says, contrary to what the court had stated, the collective knowledge of the officers is attributed or imputed to all of the officers, including the arresting officer, even if he does not know who the defendant is. Wasn't there a reading where Officer Coby was briefed on all the information that had been gathered? I believe that is correct, Your Honor. I'm quite confident. And then Officer Coby told Officer Abernathy to watch that car, and then when someone left in that car, Officer Coby directed the car to be stopped. That is my understanding completely, Your Honor. And so, in this case, it is an incorrect statement that all officers engaged in the collective investigation must each have all of those individual components. If that were the case, there could never be a stop on an all-violence bulletin. This car is wanted for whatever. That's stopped by a police officer who knows relatively little about anything except that. And that sure looks like that car. There couldn't be a be on the lookout call either about a car that might have been involved in something. And that is not what the law is. The Fox case establishes that. The State believes it did establish reasonable suspicion for the stop, as well as probable cause for the arrest when the driver was found to be suspended, have a suspended license. So in the absence of any other questions, the State apologizes for the troubling nature of the case, but also respectfully asks you to rehearse and remand. Thank you, Your Honor. Thank you, Ms. Naum. And we'll take the matter under advisement and render a ruling in due course.